Filed 4/27/23; Certified for Partial Publication 5/19/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SAVE BERKELEY'S NEIGHBORHOODS,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>      Defendants and Appellants. | A163810<br><br>(Alameda County Super. Ct. No. RG19022887) |

Save Berkeley's Neighborhoods (SBN) filed a petition for writ of mandate pursuant to the California Environmental Quality Act (Pub. Resources Code,[1] § 21000 et seq.; CEQA) challenging (1) the Regents of the University of California's (Regents) adoption of a project to develop new academic, residential, and parking buildings on University of California, Berkeley's (UC Berkeley) campus, and (2) the Regents' certification of the related final supplemental environmental impact report (SEIR). The trial court granted the petition, finding in relevant part that certain aspects of the SEIR's analysis of increased student enrollment at UC Berkeley did not

---

[1] All undesignated statutory references are to the Public Resources Code unless otherwise noted.

comply with CEQA. The court ordered the Regents to decertify and revise the SEIR and suspend any further increases to student enrollment.

On appeal, the Regents assert the judgment suspending student enrollment exceeds the court's jurisdiction and runs afoul of Senate Bill No. 118 (Reg. Sess. 2021–2022) (Senate Bill 118), and the SEIR complies with CEQA. In supplemental briefing, the Regents further assert SBN's challenge to the SEIR's analysis of student enrollment increases is moot due to the Regents' subsequent certification of a new long-range development plan (2021 LRDP) and related environmental impact report (2021 EIR).

SBN filed a cross-appeal, asserting the trial court erred in finding (1) the SEIR's project description complied with CEQA, (2) the SEIR's mitigation for significant impacts on historic resources was appropriate, and (3) the SEIR adequately analyzed aesthetic impacts from increased enrollment. SBN further claims the trial court erred in denying its claims for equitable and promissory estoppel.

We conclude certification of the 2021 EIR and passage of Senate Bill 118 moots SBN's challenge to the student enrollment increases and makes unenforceable the trial court's orders suspending student enrollment increases. We also affirm the trial court's conclusion that the SEIR's project description complies with CEQA and find no error in the SEIR's discussion of mitigation measures for historic resources.[2] Because there are no

---

[2] On March 8, 2022, the Regents requested this court take judicial notice of (1) its approval of its 2021 LRDP and 2021 EIR, and (2) a document entitled, "California Environmental Quality Act Findings of Fact Regarding The Final Environmental Impact Report for the UC Berkeley 2021 Long Range Development Plan." On August 8, 2022, the Regents requested this court take judicial notice of an order and judgment denying petitions for writ of mandate in *Berkeley Citizens for a Better Plan v. Regents of University of California* (Super. Ct. Alameda County, No. 21CV000995). SBN opposed both requests as irrelevant to the issues in this appeal. On September 16,

outstanding issues regarding the SEIR's compliance with CEQA, we vacate the trial court's order and remand the matter for the court to enter an order dismissing SBN's petition.

## I. BACKGROUND

### A. *Factual Background*

In 2005, the Regents prepared and adopted a long-range development plan (LRDP) to provide "a framework for land use and capital investment to meet the academic goals and objectives of [UC Berkeley] through the year 2020." In connection with the LRDP, the Regents prepared an EIR regarding the programmatic effects of the LRDP (2005 EIR). The 2005 EIR noted the LRDP did not commit UC Berkeley to any specific project, but "represents a maximum amount of net new growth in the UC Berkeley space inventory through 2020–2021, which the University could substantially exceed only by

2022, amici curiae City of Goleta and City of Santa Cruz filed a request, which was opposed by the Regents, that this court take judicial notice of a petition and complaint in two other matters and a report from the Santa Cruz Fire Department. We deny these three requests for judicial notice because these documents are "not relevant to disposition of this appeal." (*Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 221, fn. 13.) On December 1, 2022, the parties filed a joint motion and request for judicial notice of the draft 2021 EIR and the final 2021 EIR. We grant this request. The Regents also separately requested this court take judicial notice of six petitions challenging its adoption and certification of the 2021 LRDP and 2021 EIR. On December 16, 2022, SBN opposed the Regent's request and filed its own motion, requesting this court take judicial notice of a comment letter submitted by the Southside Neighborhood Consortium to the draft 2021 LRDP and 2021 EIR. We also deny these two requests for judicial notice because these documents are "not relevant to disposition of this appeal." (*Ibid.*)

On September 2, 2022, SBN requested leave to file a sur-reply brief. In light of the new arguments raised by the Regents in their reply brief due to the Legislature's adoption of Senate Bill 118, we grant SBN's request and have considered the arguments raised in SBN's sur-reply.

amending the LRDP."  As part of that analysis, and as relevant to this appeal, the 2005 EIR projected UC Berkeley's campus population would levelized at 51,250 by 2020.

In 2018, the Regents approved a new development for additional academic space and campus housing, and certified the SEIR.  The project sought to demolish an existing parking structure and construct apartment housing above a new parking structure and a new academic building adjacent to the new residential building (Upper Hearst Development project).  The SEIR also "establishe[d] an updated population baseline to reflect the existing campus headcount (which is greater than the projections in the [2005 EIR])," and evaluated the environmental impacts of this updated population baseline in connection with both the 2005 EIR and the SEIR.

## B.  *Save Berkeley I*

In 2018, SBN filed a petition for writ of mandate and a complaint for declaratory relief challenging the Regents' decisions to increase enrollment beyond the level set forth in the 2005 EIR without further CEQA review. (*Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, 233 (*Save Berkeley I*).)  That petition alleged, "When [the Regents] prepared the 2005 EIR for the development plan, the projected increase of 1,650 students was part of the 'project description,' as that term is used in CEQA.  (See [Cal. Code Regs., tit. 14], § 15124.)  [The Regents] then changed the project when they approved enrollment increases beyond this amount.  These enrollment increases caused, and continue to cause, significant environmental impacts that were not analyzed in the 2005 EIR, including increased use of off-campus housing by U.C. Berkeley students (leading to increases in off-campus noise and trash), displacement of tenants and a consequent increase in homelessness, more traffic, and increased

4

burdens on the City of Berkeley's public safety services (police, fire, and ambulance)." (*Save Berkeley I*, at p. 233, fn. omitted.) SBN alleged CEQA required the Regents "to prepare an EIR to analyze these impacts and to identify and adopt mitigation measures to reduce them." (*Save Berkeley I*, at p. 233.)

The Regents filed a demurrer, "contending [SBN] cannot state a cause of action for violation of CEQA because, under section 21080.09, the enrollment increases are not a CEQA 'project' or a project change requiring subsequent environmental review. [The Regents] also argued [SBN's] claims were barred by the applicable statute of limitations or moot. In support of the latter argument, [the Regents] asked the trial court to judicially notice their issuance of a 'Notice of Preparation of a Draft Supplemental [EIR]' for a project entitled 'Upper Hearst Development for the Goldman School of Public Policy and Minor Amendment to the 2020 Long Range Development Plan,' which is dated August 15, 2018. [The Regents] contended the [SEIR] would analyze not only a new physical development but also the increase in current and foreseeable campus population levels." (*Save Berkeley I*, *supra*, 51 Cal.App.5th at pp. 233–234.)

"The trial court sustained the demurrer without leave to amend, concluding [SBN's] petition was barred by the statute of limitations '[t]o the extent [it] challenges the adequacy of the 2005 EIR' and that ' "informal, discretionary decisions" to increase student enrollment beyond that anticipated in the [development plan]' did not constitute 'project changes' necessitating CEQA review." (*Save Berkeley I*, *supra*, 51 Cal.App.5th at p. 234.)

Our colleagues in Division Five of this court reversed. The court noted SBN alleged in its petition that the Regents "made several discretionary

5

decisions to change the project by increasing enrollment beyond 1,650 students," these increases "have caused, and continue to cause, significant environmental impacts that were not analyzed in the 2005 EIR," and the Regents "failed to analyze the new impacts in a CEQA document" or "adopt mitigation measures to reduce or avoid them." (*Save Berkeley I*, *supra*, 51 Cal.App.5th at p. 237.) The court concluded these allegations adequately supported SBN's claim that the Regents "made substantial changes to the original project that trigger the need for a subsequent or supplemental EIR." (*Ibid.*)

The court also rejected the Regents' argument that section 21080.09 effectively exempted them from analyzing the changed increases in enrollment unless or until a physical development project is approved. (*Save Berkeley I*, *supra*, 51 Cal.App.5th at p. 237.) It concluded, "When a public university prepares an EIR for a development plan, section 21080.09 requires universities to *expand* the analysis to include a related feature of campus growth, future enrollment projections, which is entirely consistent with the traditional, broad definition of a CEQA project." (*Id.* at p. 239.) The court further noted "a public university's decision to increase enrollment levels can be a 'project' subject to CEQA whether or not it is related to a development plan." (*Id.* at p. 240.) On remand, the trial court stayed the matter pending resolution of this appeal.

## C. *The Current Petition*

On June 13, 2019, SBN filed a petition for writ of mandate challenging the Upper Hearst Development project and seeking to vacate the Regents' certification of the SEIR on the grounds that the approval violated CEQA. The petition identified various alleged omissions from the SEIR and asserted the Regents (1) "[f]ailed and refused to recirculate a revised draft

6

supplemental EIR including said necessary information," (2) failed to prepare and certify "a subsequent, rather than supplemental EIR," and (3) failed to make certain required findings or support findings with substantial evidence. The petition named the Regents, Janet Napolitano, and Carol T. Christ as respondents in the action.[3] The petition requested in relevant part that the court void approval of the project and order the respondents to take any other necessary acts to comply with CEQA.

Following briefing on the merits but in advance of the hearing, the court requested the parties address nine issues. The majority of the questions involved the increased student enrollment and whether that issue was properly analyzed in the SEIR.

In responding to these questions, the Regents commented: "The project analyzing the SEIR was the Upper H[ea]rst Development, which included a projection of enrollment increases to 2022 when the project would open. And these additional students were not part of any project approval. If you look at the Regents['] approval, they approved the GSPP [(Upper Hearst Development)] project. They did not approve additional enrollment. . . . [¶] . . . The future increases were part of the project analysis, cumulative analysis in the SEIR. But again, they're not part of any project approval."

While the Regents argued student enrollment increases were not part of the "project," it acknowledged the analysis of increased enrollment was part of the SEIR and subject to judicial review. Specifically, the Regents

_____

[3] SBN filed an amended petition for writ of mandate, which was substantively identical to the initial petition except it added American Campus Communities and Collegiate Housing Foundation as real parties in interest. This court affirmed the order dismissing those parties in *Save Berkeley's Neighborhoods v. Regents of University of California* (2021) 70 Cal.App.5th 705.

7

stated: "[The court] will decide whether the [Regents] goes to [*sic*] analyzing the environmental impacts of the 7,500 additional students above and beyond the 2020 LRDP projections compliant with CEQA. That's an issue, obviously, in these cases. It's part of this challenge, and I think I've consistently told [the court] that, even though our approach to how we handle that is unusual, but, obviously, it is subject to the court's review and determination. [¶] . . . A judicial determination on this issue in these cases will moot the [*Save Berkeley I*] case. I believe that's the relief that's been requested in [*Save Berkeley I*] was environmental review of the increased enrollment from 2005 to 2017. And that's what the court will be ruling upon in these cases."

The Regents also represented its assessment of student enrollment increases went beyond merely providing a baseline for the Upper Hearst Development project: "As to your second question . . . , did the Regents study the environmental impacts of the increases in the SEIR? The answer is yes. But to the rest of that question or were these increases simply used as a baseline? The answer is no. And again, this is an unusual case. As we've explained to the court before, the [Regents] analyzed the potential environmental impacts of the additional students in connection with preparation of an updated baseline in this SEIR. [¶] As we say in our briefs . . . , normally the baseline or the conditions on the ground—existing conditions when the NOP[4] is published. In this case, August of 2018. However, as I've also said, there's 7,500 additional students present or enrolled at the UC Berkeley campus at the time the NOP was published. They had already been enrolled. They were there and there was no discretionary approval involved with those 7,500 students at that time. [¶] Now, technically, under section 105125, the [Regents] would have said,

_____

[4] "NOP" is an acronym for "notice of preparation."

they're there. They're part of the baseline. Let's go on. Let's look at the impacts of the [Upper Hearst Development project], but it didn't do that. And I believe that, again, although unusual, if there's nothing illegal or nothing under the [Regent's] approach that violates CEQA and in fact, it better serves the purposes of CEQA by being an information disclosing document that talked about the impacts of those students . . . as well as the project that was under review."

The trial court subsequently granted the writ of mandate. The court noted the Regents' " 'updated baseline' analysis does not fit well within a traditional CEQA framework." It criticized the SEIR for "attempt[ing] to analyze an increase in student enrollment without admitting that increasing student enrollment is a project subject to review." However, it concluded SBN's challenge to past enrollment increase was properly subject to judicial review based on the statements made by the Regents' counsel at the hearing.

In addressing the adequacy of the SEIR's analysis, the court found the SEIR insufficiently analyzed the impacts on housing, public services, and noise, and failed to consider possible alternatives. Specifically, as to housing and population, the court noted "the SEIR dismisses the displacement and indirect population impacts of the 'update' portion of the updated baseline as outside the scope of its study" and asserted "concerns about student and induced nonstudent homelessness" involved "speculation" that "is beyond [the SEIR's] scope." The court concluded "[i]ncreases in campus population foreseeably lead to direct and indirect impacts on housing, population, and displacement, and the failure to consider those impacts constitutes a prejudicial abuse of discretion." The court also determined the SEIR's conclusion "that no new displacement impacts would result from the

9

construction of new University housing" "fails to consider indirect displacement impacts."

As to impacts on the demand for public services, the court stated the Regents dismissed staffing and equipment purchases as " 'fiscal matters' " rather than environmental impacts. The court also noted the Regents did not believe new or physically altered fire protection facilities would be required due to the increased headcount. The court took issue with this approach, noting the City of Berkeley submitted evidence of physical impacts due to increased service calls and a corresponding need for additional personnel and new facilities. The court concluded "no substantial contradictory evidence" indicated the increased demand was not connected to the increased headcount, and the SEIR's failure to discuss this issue was an abuse of discretion.

The court next addressed the parties' arguments regarding noise and aesthetic impacts. On these issues the SEIR concluded there was no significant impact because neighborhoods around UC Berkeley already accommodated a high proportion of off-campus student rentals. The court explained this analysis constituted an abuse of discretion because it "compares . . . its current student enrollment numbers to the present, post-increase status quo" rather than "to a baseline before the increase." The court noted nothing supported the SEIR's conclusion that increased headcount would not exacerbate noise issues, and rejected the SEIR's conclusion that Berkeley's noise ordinance was an adequate remedy. However, the court found the Regents could reasonably conclude that once-a-year, moving-day trash did not constitute a " 'substantial' effect on the environment."

10

Finally, the court determined it "cannot endorse [the Regents'] conclusion that the lack of analysis of a reduced enrollment alternative is legally permissible" because "the environmental analysis was flawed."

Apart from the student enrollment increases, SBN also argued the Regents failed to properly consider (1) the historical context of the new buildings comprising the Upper Hearst Development project, and (2) noise and traffic impacts. As to the historical impacts, the SEIR considered buildings on or immediately adjacent to the Upper Hearst Development project site, and concluded the project would negatively impact three historical buildings. The SEIR proposed as a mitigation measure retaining a historical architect to review plans for the proposed buildings and " 'provide input and refinements to the design team . . . to improve compatibility with neighboring historical resources.' " SBN claimed the Regents failed to consider surrounding historical resources and disputed the validity of the proposed mitigation measure. The trial court rejected SBN's arguments. It first concluded the Regents did not abuse its discretion in limiting its review of historical resources to those on or adjacent to the building site. The trial court found the Regents did not abuse its discretion in adopting the proposed mitigation measure because it required the Regents to take certain steps, including adopting the United States Secretary of the Interior's Standards for the Rehabilitation and Guidelines for Rehabilitating Historic Buildings (Secretary of the Interior's Standards). (See Cal. Code Regs., tit. 14, § 15064.5, subd. (b)(3).)

The court also found the Regents did not fail to adequately analyze noise and traffic impacts. The court concluded substantial evidence supported the SEIR's conclusion that a decrease in parking would correlate with reduced trip generation. The court also rejected SBN's arguments that

11

the SEIR failed to consider traffic impacts from construction of the Upper Hearst Development project and noise impacts from construction and subsequent use of the Upper Hearst Development project.

The trial court entered judgment and ordered the Regents, in relevant part, "to void any decision or decisions they may have made prior to entry of this Judgment to increase student enrollment in academic year 2022–2023 or later above the level of student enrollment at UC Berkeley in academic year 2020–2021," "to void their decision to carry out the Upper Hearst Development [project]," and "to decertify the [SEIR]." The judgment also ordered the Regents (1) "to suspend any further increases in student enrollment at UC Berkeley . . . until [the Regents] have demonstrated full compliance with this Judgment and Writ and the Court orders discharge of the Writ"; and (2) revise the SEIR to remedy the deficiencies identified in the judgment and certify the revised SEIR.

## D. The Appeal and Writ Proceedings Before This Court

In October 2021, the Regents timely appealed from the order granting the writ petition. SBN also filed a notice of cross-appeal. Approximately three months later, and after the parties had proposed and the court established a briefing schedule, the Regents filed a petition for writ of supersedeas with this court. It argued the trial court's order limiting enrollment exceeded its authority and could "have serious, immediate, and irreparable consequences." The Regents asserted an immediate stay was required "to ensure that thousands of matriculating high school seniors deserving of admission to UC Berkeley are not denied that admission during the pendency of the appeal."

This court denied the request for temporary stay and the petition for writ of supersedeas. We concluded "it appears far more probable that the

12

fruits of the *judgment* will be lost if a stay is issued than that the fruits of reversal will be lost if it does not." Moreover, this court noted the Regents failed to demonstrate irreparable harm in light of its multi-month delay in seeking a stay or supersedeas, and its failure to offer any explanation for such delay. The Regents' petition for review and application for stay to the California Supreme Court were subsequently denied. The parties then proceeded with this pending appeal.

## II.  DISCUSSION

### A.  *Standard of Review*

" '[I]n a mandate proceeding to review an agency's decision for compliance with CEQA, we review the administrative record de novo [citation], focusing on the adequacy and completeness of the EIR and whether it reflects a good faith effort at full disclosure. [Citation.] Our role is to determine whether the challenged EIR is sufficient as an information document, not whether its ultimate conclusions are correct. [Citation.]' An EIR is presumed adequate. (§ 21167.3, subd. (a).)" (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 96 (*County of San Diego*).)

"We review an agency's action under CEQA for a prejudicial abuse of discretion. (§ 21168.5.) 'Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*County of San Diego, supra,* 141 Cal.App.4th at p. 96.)

"In defining the term 'substantial evidence,' the CEQA Guidelines[5] state: ' "Substantial evidence" . . . means enough relevant information and

---

[5] The CEQA Guidelines are found at California Code of Regulations, title 14, section 15000 et seq.

13

reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.  Whether a fair argument can be made . . . is to be determined by examining the whole record before the lead agency.  Argument, speculation, unsubstantiated opinion[,] narrative [or] evidence which is clearly erroneous or inaccurate . . . does not constitute substantial evidence.'  ([Cal. Code Regs., tit. 14], § 15384, subd. (a).)  'In applying the substantial evidence standard, we resolve all reasonable doubts in favor of the administrative finding and decision.' "  (*County of San Diego*, *supra*, 141 Cal.App.4th at p. 96.)

Although an agency's "factual determinations are subject to the foregoing deferential rules of review, 'questions of interpretation or application of the requirements of CEQA are matters of law.  [Citations.] While we may not substitute our judgment for that of the decision makers, we must ensure strict compliance with the procedures and mandates of the statute.' "  (*County of San Diego*, *supra*, 141 Cal.App.4th at p. 96.)

## B. Judicial Review of the SEIR's Analysis of Student Enrollment Increases

As a threshold issue, the parties disagree as to whether the trial court was entitled to evaluate the Regents' analysis of the student enrollment increases under CEQA.  The Regents argue its discussion of student enrollment increases was merely in connection with establishing a baseline from which to evaluate the potential environmental impacts of the Upper Hearst Development project.  Conversely, SBN argues the Regents stated it conducted a CEQA analysis of the enrollment increases that was subject to judicial review in this proceeding, and the Regents thus waived any argument to the contrary by stipulation, judicial admission, or waiver.

As an initial matter, we agree the Regents were not *required* to conduct a CEQA analysis of the student enrollment increases as part of its analysis of

14

the Upper Hearst Development project. CEQA requires that a project's environmental impacts be assessed against "the existing 'baseline physical conditions.' " (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1167; see also *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 559 ["the 'normal' rule is that the baseline must reflect the 'physical conditions existing at the time [the] environmental analysis' begins"].) And increased enrollment was indisputably already part of the existing environmental conditions at the time the Regents began its environmental review for the Upper Hearst Development project. Numerous courts have concluded that a baseline should reflect existing conditions, even if doing so precludes full environmental review of past actions. (See, e.g., *Citizens for East Shore Parks v. State Lands Com.*, at p. 561; *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1452–1453 [respondents could not turn back the clock and insist upon a baseline that excluded existing conditions]; *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1280–1281 [county acted within its discretion in considering current airport operations for baseline despite past airport development conducted without proper authorization].)

Likewise, we note increased student enrollment would not necessarily have triggered CEQA review due to Senate Bill 118. As discussed in greater detail in part II.C.2., *post*, Senate Bill 118 amended section 21080.09, subdivision (d) to state, "Enrollment or changes in enrollment, by themselves, do not constitute a project."

SBN asserts the Regents cannot now raise these arguments because they have been waived by either stipulation or judicial admission. "A judicial admission is a party's unequivocal concession of the truth of a matter, and removes the matter as an issue in the case." (*Gelfo v. Lockheed Martin Corp.*

(2006) 140 Cal.App.4th 34, 48.)  The doctrine of judicial admissions is similar to the doctrine of judicial estoppel.  The purpose of these doctrines is to protect the integrity of the judicial process.  (*Jogani v. Jogani* (2006) 141 Cal.App.4th 158, 169.)  They are " ' "aimed at preventing fraud on the courts [and]" . . . " ' "[are] invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process . . . . 'The policies underlying preclusion of inconsistent positions are "general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings." ' . . . 'It seems patently wrong to allow a person to abuse the judicial process by first [advocating] one position, and later, if it becomes beneficial, to assert the opposite.' " ' " (*Id.* at pp. 169–170.)

As noted in the factual background, prior to the merits hearing the trial court asked the parties to address specific questions regarding whether the student enrollment increases were part of the SEIR rather than just the baseline and whether the impact of such increases were subject to judicial review.  As to those issues, the Regents acknowledged the court would evaluate whether its analysis of "the environmental impacts of the 7,500 additional students above and beyond the 2020 LRDP projections [is] compliant with CEQA."  The Regents further recognized it was "an issue . . . in these cases," "part of this challenge," and "obviously . . . is subject to the court's review and determination."  The Regents further asserted:  "A judicial determination on this issue in these cases will moot the [*Save Berkeley I*] case.  I believe that[ ] the relief that's been requested in [*Save Berkeley I*] was environmental review of the increased enrollment from 2005 to 2017.  And that's what the court will be ruling upon in these cases."

The Regents also—in contrast to its arguments raised on appeal—stated its analysis of the environmental impacts of the student enrollment increases in the SEIR were *not* simply used as a baseline. The Regents explained its approach to the trial court as follows: "[T]he [Regents] analyzed the potential environmental impacts of the additional students in connection with preparation of an updated baseline in this SEIR. [¶] As we say in our briefs, . . . normally the baseline or the conditions on the ground—existing conditions when the NOP is published. In this case, August of 2018. However, as I've also said, there's [*sic*] 7,500 additional students present or enrolled at the UC Berkeley campus at the time the NOP was published. They had already been enrolled. They were there and there was no discretionary approval involved with those 7,500 students at that time. [¶] Now, technically, under section 105125, the [Regents] would have said, they're there. They're part of the baseline. Let's go on. Let's look at the impacts of the [Upper Hearst Development project], *but it didn't do that*. And I believe that, again, although unusual, if there's nothing illegal or nothing under the [Regents'] approach that violates CEQA and in fact, it better serves the purposes of CEQA by being an information disclosing document that talked about the impacts of those students . . . as well as the project that was under review."[6] (Italics added.) The trial court then relied on these

_____

[6] Without opining on the merits of such an argument as it was not raised by SBN, we note section 21166 imposes an "obligation to conduct supplemental review . . . regardless of whether the project under consideration has undergone previous project-specific environmental review, or is being carried out under a plan for which the agency has previously certified a program EIR." (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1051.) Such supplemental review is triggered in part when "[s]ubstantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact

17

representations in stating, "At the hearing on the petition, . . . the parties stipulated that the SEIR's analysis of the impacts of the increase in enrollment was subject to judicial review in this proceeding without resolving the issue of whether the increases to student enrollment that led to the Excess Population were a part of the project studied in the SEIR." The trial court thus concluded it "d[id] not need to determine whether that past increase was part of the project under study here."

Accordingly, the record indicates the Regents acknowledged the increased enrollment was subject to judicial review, was part of the pending challenge, and would be addressed by the trial court.[7] The Regents cannot

_____

report." (§ 21166, subd. (b).) We note the draft SEIR stated: "UC Berkeley made a commitment to the City of Berkeley that, if enrollment increased beyond the projections set forth in the 2020 LRDP, it would undertake additional review under CEQA. [¶] *Consistent with this commitment*, the SEIR uses an updated population baseline and, in its environmental analysis of each impact category, takes this updated baseline into account and explains how it factors into and/or affects the environmental analysis and significant conclusions reached in the 2020 LRDP EIR and this SEIR." (Italics added.) The final 2021 EIR also stated the SEIR addressed "the 'significant environmental impacts of unanticipated enrollment growth that has already occurred at UC Berkeley.'" Likewise, the Regents argued to Division Five of this court in its prior appeal, *Save Berkeley I*, that the appeal was moot because "[t]here is no effective relief that can be granted . . . . The [SEIR] did exactly what [SBN] asks for and conducted supplemental CEQA review of amendments to the LRDP, which included an analysis of the impacts of increased enrollment."

[7] On appeal, the Regents contend these concessions do not constitute a waiver or judicial admission because they only acknowledged the analysis of increased enrollment was subject to judicial review and not that it was part of the Upper Hearst Development project. What the Regents omit, however, is what type of judicial review is appropriate in light of their simultaneous argument that the trial court's CEQA review was erroneous.

18

now argue otherwise.  The trial court thus did not err in assessing the adequacy of the Regents' CEQA analysis of increased enrollment.[8]

## C.  *Validity of the Enrollment Increase Analysis Under CEQA*

The Regents next challenge the trial court's finding that the student enrollment analysis failed to comply with CEQA.  Specifically, the Regents argue (1) SBN's challenge to the student enrollment increase is moot due to certification of the 2021 EIR, (2) the remedies imposed by the trial court violate Senate Bill 118, and (3) the student enrollment analysis satisfied the requirements of CEQA.

### 1.  Mootness

In supplemental briefing, the Regents argue SBN's challenge to the SEIR's analysis of student enrollment increases is moot considering the subsequently certified 2021 EIR.  In response, SBN asserts the 2021 EIR does not supplant the analysis of increased campus population in the SEIR.

### a.  *Additional Relevant Background*

In 2021, the Regents issued a draft environmental impact report (2021 draft EIR) that, in relevant part, "would replace UC Berkeley's existing LRDP, which was evaluated in the certified EIR for a horizon year of 2020." (Fn. omitted.)  The 2021 draft EIR utilized a "buildout horizon year of the 2036–37 academic year . . . to provide a basis for evaluating associated environmental impacts in this EIR."  While "[t]he proposed LRDP Update

---

[8] SBN also argues the trial court erred in denying its alternative claims for equitable and promissory estoppel regarding the increased enrollment analysis being part of the SEIR and subject to judicial review in this action.  However, it notes, "If this Court affirms the trial court's order that the legal sufficiency of the SEIR's environmental evaluation of the Updated Campus Headcount is subject to judicial review in this action, . . . [SBN's] equitable and promissory estoppel claims would be moot."  Accordingly, we find these claims moot.

19

does not determine future UC Berkeley enrollment or population, or set a future population limit for UC Berkeley," the proposed LRDP update would "establish a maximum amount of net new growth in UC Berkeley's space inventory during this time frame, which the UC Berkeley campus may not substantially exceed without amending the LRDP and conducting additional environmental review as necessary."

The 2021 draft EIR evaluated the potential environmental impact of the LRDP update on the areas of aesthetics, air quality, biological resources, cultural resources, energy, geology and soils, greenhouse gas emissions, hazards and hazardous materials, noise, population and housing, public services, parks and recreation, transportation, tribal cultural resources, utilities and service systems, and wildfire. In assessing the population increase at UC Berkeley, the 2021 draft EIR utilized the existing conditions as of 2018 as its baseline for assessing environmental impact.

In July 2021, the Regents issued the final EIR for the approval and implementation of the proposed 2021 LRDP. In response to public comments, the 2021 EIR included "Master Response 17," entitled "2005 LRDP EIR Population Projections." The response sought to address requests by the City of Berkeley and others "that the EIR account for the 'significant environmental impacts of unanticipated enrollment growth that has already occurred at UC Berkeley as well as impacts of additional future population growth proposed.'" Accordingly, the "response provides an evaluation of the program-level environmental impacts of the LRDP Update to address UC Berkeley population growth between 2007 (when the 2005 LRDP EIR student and total UC Berkeley population projections were first exceeded) and the 2018–19 baseline population" used in the 2021 EIR. In doing so, the response "analyzes the effects of population growth using as a baseline the population

20

level projected in the 2005 LRDP EIR, rather than the UC Berkeley population in the 2018–19 school year." This analysis focused on seven categories: air quality, greenhouse gas emissions, noise, population and housing, public services, parks and recreation, and transportation.[9]

With regard to noise, the 2021 EIR focused exclusively on traffic noise as a result of the project. The 2021 EIR noted roadway volume, and the corresponding noise level, decreased between 2007 and 2018. As a result, it concluded the potential impact of increased traffic noise for the 2021 LRDP using the 2018 baseline would reflect a greater environmental impact than if analyzed using the 2007 baseline.

In connection with population and housing, the 2021 EIR acknowledged using the 2007 baseline would increase the population seeking off-campus housing, and "the local direct and increased population growth projected under the LRDP Update . . . would be a significant impact." The response further noted, however, the impact "would be less than significant with the implementation of Mitigation Measure POP-1."[10] It concluded "[t]he increased population evaluated in this master response would not create any additional impacts not evaluated in the [2021] Draft EIR."

As to public services, the response first noted, "since 2007 [the University of California Police Department] has not physically expanded its

[9] Because the trial court found the SEIR deficient as to housing, public services, and noise, we only address the 2021 EIR's discussion of those categories rather than all seven categories.

[10] "Mitigation Measure POP-1" states: "UC Berkeley would provide an annual summary of LRDP enrollment and housing production data, including its LRDP enrollment projections and housing production projections, to the City of Berkeley and [the Association of Bay Area Governments] for projection purposes, ensuring that local and regional projections are prepared with knowledge of UC Berkeley enrollment and housing projections."

facilities" and "according to City of Berkeley fiscal reports between 2008 and 2019, the [Berkeley Police Department] did not expand its physical facilities as a result of the increased UC Berkeley population during this time period." The response thus concludes, "Because the exceeded population that occurred in 2007 did not result in new or physically altered police facilities that would have potentially resulted in environmental impacts, this population did not impact police services beyond what was addressed in the [2021] Draft EIR." Second, the response reached a similar conclusion as to fire protection services. It noted the increased population did not result in impacts to the Berkeley Fire Department because it "did not expand its physical facilities as a result of the increased UC Berkeley population [between 2008 and 2019]."

### b. Analysis

" 'Because " 'the duty of . . . every . . . judicial tribunal . . . is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or . . . to declare principles or rules of law which cannot affect the matter in issue in the case before it[,] [i]t necessarily follows that when . . . an event occurs which renders it impossible for [the] court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment . . . .' [Citations.]" [Citation.] The pivotal question in determining if a case is moot is therefore whether the court can grant the plaintiff any effectual relief. [Citations.] If events have made such relief impracticable, the controversy has become "overripe" and is therefore moot. [Citations.] [¶] . . . When events render a case moot, the court, whether trial or appellate, should generally dismiss it.' " (*Parkford Owners for a Better Community v. County of Placer* (2020) 54 Cal.App.5th 714, 722; see also *Golden Gate Land Holdings LLC v. East Bay Regional Park Dist.* (2013) 215 Cal.App.4th 353, 366 [" '[A]

22

case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief.' "].) "General principles for determining whether an appeal is moot have been applied to CEQA cases." (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1547–1548.) However, courts have held the subsequent preparation and certification of an EIR does not necessarily moot a prior appeal. (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 127.) Instead, courts must look at whether the project has "undergone irreversible physical or legal changes" that render the relief sought unavailable. (*Ibid.*)

SBN first argues the 2021 EIR does not moot the current appeal because it does not address the flaws in the SEIR or replace the 2005 EIR. It contends the 2021 EIR uses 2018 as its baseline for analyzing the impacts of increased enrollment on population, housing, and public services. SBN further asserts this court can provide it with effective relief by ruling in SBN's favor on the inadequacy of the SEIR and require the Regents "to adequately analyze [the] effects of the Updated Campus Headcount." We disagree.

Contrary to SBN's position, the 2021 EIR specifically states it replaces the 2005 EIR. The draft 2021 EIR notes the 2005 EIR "requires updating" and "[t]he proposed LRDP Update analyzed in this EIR would replace the current LRDP . . . ." Likewise, the final 2021 EIR states the updated LRDP would "replace UC Berkeley's existing LRDP." The SEIR's analysis of student enrollment increases, which "supplement[ed] the 2005 EIR's analysis" thus addresses an EIR that is no longer in effect.

Moreover, the 2021 EIR directly analyzes the past increases since 2007 and is not, as SBN claims, limited to the increase in campus population between 2018 and 2037. The 2021 EIR contains a section entitled "Master

23

Response 17. 2005 LRDP EIR Population Projections," which "provides an evaluation of the program-level environmental impacts of the LRDP Update to address UC Berkeley population growth between 2007 (when the 2005 LRDP EIR student and total UC Berkeley population projections were first exceeded) and the 2018–19 baseline population." The 2021 EIR acknowledged "UC Berkeley addressed this issue in 2019 as part of the evaluation presented in the [SEIR]," but stated it was again addressing the population growth in response to various comments requesting such an analysis be included in the 2021 EIR. The 2021 EIR evaluated the environmental impacts of UC Berkeley's population growth between 2007 and 2018–2019 as to air quality, noise, parks and recreation, greenhouse gas emissions, population and housing, transportation, and public services. While we do not opine upon the adequacy of this analysis because challenges to the 2021 EIR are not part of this appeal, SBN is incorrect that an analysis of past student enrollment increases was not part of the 2021 EIR.

Finally, SBN asserts this court can provide effective relief by affirming the trial court's rulings in SBN's favor. However, as discussed below Senate Bill 118 precludes this court from doing so.[11] Accordingly, SBN has failed to identify any effective relief this court can provide in light of the Regents'

---

[11] SBN also argues this court should rule on the merits of its claims based on certain exemptions to technical mootness. Specifically, SBN claims the issues raised are likely to reoccur and are of public interest. We decline to apply such exemptions. First, the 2005 EIR has been replaced and thus challenges to it are unlikely to reoccur. Nor is it likely that public agencies will adopt and certify new EIR's merely to avoid litigation; the lengthy and onerous process of certifying such EIR's negates such a risk. Likewise, while the public may have an interest in the campus population at UC Berkeley, those interests—as noted by SBN—are presumably represented in the litigation involving the 2021 EIR.

certification of the 2021 EIR and passage of Senate Bill 118.  We thus hold SBN's challenge to the increased enrollment analysis in the SEIR is moot.

### 2. Senate Bill 118

Regarding SBN's challenge to the student enrollment increase analysis, the judgment (1) voided "any decision or decisions [the Regents] may have made . . . to increase student enrollment in academic year 2022–2023 or later above the level of student enrollment at UC Berkeley in academic year 2020–2021," and (2) ordered the Regents "to suspend any further increases in student enrollment at UC Berkeley, in academic years 2022–2023 and later, above the level of student enrollment in academic year 2020–2021 until [the Regents] have demonstrated full compliance with this Judgment and Writ and the Court orders discharge of the Writ."  The Regents assert Senate Bill 118 makes these two provisions unenforceable.[12]

Senate Bill 118 modified section 21080.09 to alter the focus from enrollment to "campus population" and clarify that "Enrollment or changes in enrollment, by themselves, do not constitute a project" for purposes of CEQA. (§ 21080.09, subd. (d).)  Senate Bill 118 also added subdivision (e), which limited the remedies available to the court if it finds deficiencies in the environmental review based on enrollment.  Subdivision (e)(1) provides:  "If a court determines that increases in campus population exceed the projections adopted in the most recent long-range development plan and analyzed in the supporting environmental impact report, and those increases result in significant environmental impacts, the court may order the campus or medical center to prepare a new, supplemental, or subsequent environmental

---

[12] The Regents also assert these two sections of the judgment and writ violate section 21168.9 and legislative expectations for the University of California system.  We need not reach these issues because we conclude Senate Bill 118 applies and voids these provisions.

impact report.  Only if a new, supplemental, or subsequent environmental impact report has not been certified within 18 months of that order, the court may . . . enjoin increases in campus population that exceed the projections adopted in the most recent long-range development plan and analyzed in the supporting environmental impact report."  (§ 21080.09, subd. (e)(1).)  Subdivision (e)(2) then voids any preexisting injunctions or judgments: "Notwithstanding any other provision of this division, any injunction or judgment in effect as of the effective date of this subdivision suspending or otherwise affecting enrollment shall be unenforceable."  (§ 21080.09, subd. (e)(2).)

### a.  *Validity of Senate Bill 118*

SBN argues Senate Bill 118 violates the separation of powers doctrine because the provision abrogating freezes on enrollment or campus population unconstitutionally interferes with the court's exercise of judicial powers.

"The separation of powers doctrine holds that one branch of the government cannot exercise essential powers that our state Constitution has delegated to another branch.  [Citation.]  'A core function of the Legislature is to make statutory law . . . . A core function of the judiciary is to resolve specific controversies between parties.'  [Citation.]  Thus, '[w]hen cases become final for separation of powers purposes, the Legislature may not . . . bind the courts with an after-the-fact declaration of legislative intent.'  [Citation.]  As the United States Supreme Court has explained in the context of the parallel federal separation of powers doctrine, '[w]hen retroactive legislation requires its own application in a case already finally adjudicated, it does no more and no less than "reverse a determination once made, in a particular case." ' "  (*Smart Corner Owners Assn. v. CJUF Smart Corner LLC* (2021) 64 Cal.App.5th 439, 465–466 (*Smart Corner Owners*).)

26

"However, '[s]eparation of powers principles do not preclude the Legislature from amending a statute and applying the change to both pending and future cases, though any such law cannot "readjudicat[e]" or otherwise "disregard" judgments that are already "final." ' [Citation.] 'Because the judicial branch consists of a hierarchy of courts—from district courts and appellate courts to the Supreme Court itself—a judgment has no conclusive effect for separation of powers purposes until the time for appeal has passed, or an appeal has been pursued and the review process is completed. Therefore, separation of powers principles are not implicated, and a lower court decision has not been unconstitutionally altered, when a reviewing court applies a new retroactive statute to cases still pending on appeal.' [Citation.] '[O]nly those decisions that represent "the final word of the [judicial] department as a whole," as expressed by "the last court in the hierarchy that rules on the case" ' are constitutionally protected from the effects of retroactive legislation." (*Id.* at p. 466, italics omitted.)

Here, the judgment and writ issued by the trial court was not "final" for separation of powers purposes. Rather, the Regents were entitled to, and did, appeal to this court. During that time, the Legislature passed Senate Bill 118. Accordingly, its application to this matter does not run afoul of the separation of powers doctrine.[13]

Moreover, courts have rejected separation of powers challenges to legislation that alters the prospective effect of an injunction. For example, in in *Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193 (*Mendly*), the plaintiffs initially filed suit challenging the adequacy of the county's general

---

[13] SBN argues the rule requiring that judgments be final relates to a prohibition on readjudicating finally resolved causes of action. However, SBN fails to cite any authority imposing such an interpretation.

assistance grant and, with court approval, the parties entered into a stipulated judgment that set forth a formula for payments for the next five years. (*Id*. at p. 1202.) One year into the five-year period, the Legislature passed urgency legislation which found that several counties had entered into stipulated judgments requiring the payment of general assistance at certain levels and that, due to an unanticipated fiscal emergency throughout the state, those counties would suffer serious consequences if forced to maintain those levels. (*Id*. at pp. 1200–1201.) Accordingly, the Legislature declared its intent to "abrogate the provisions of existing agreements, including court-ordered stipulated judgments, that require counties to provide general assistance grants above the current levels" and further "declared the provisions of any such agreement or court-ordered stipulated judgment 'null and void.' " (*Id*. at p. 1201.) The plaintiffs thereafter moved to enforce the stipulated judgment, arguing in part that the legislation " 'represents an impermissible legislative encroachment upon judicial authority in contravention of the separation of powers doctrine under the California Constitution,' because the legislation discarded 'a final judgment of a court.' " (*Id*. at pp. 1203, 1211.) The court disagreed, concluding that the Legislature had properly exercised its power to enact a law that prospectively abrogated the effect of a judicial decision and that the legislation did not amount to a modification of the judgment. (*Id*. at p. 1212.)

Similarly, in *Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288 (*Sagaser*), the plaintiffs unsuccessfully challenged an EIR for the construction of a prison. While their appeal was pending, the Legislature introduced and the Governor signed a bill containing an urgency clause that had the effect of exempting the prison site from CEQA compliance. (*Sagaser*, at p. 298.) Finding the legislation valid and constitutional, the court rejected several

challenges, including that the bill violated the separation of powers doctrine. (*Sagaser*, at pp. 311–312.)  *Sagaser* determined the prospective CEQA exemption "did not readjudicate or review the judgment in an attempt to determine whether the EIR was adequate."  (*Sagaser*, at p. 311.)  The court explained the Legislature did not assume the judicial branch's role; rather, the Legislature exercised its role in deciding that public policy reasons dictated that CEQA compliance was unnecessary for construction of the prison.  (*Sagaser*, at pp. 311–312.)

SBN asserts the dissent, rather than the majority opinion, in *Mendly* "provides the correct analysis" because nullifying judgments infringes on the judiciary.  SBN also seeks to distinguish *Mendly* because the judgment "arguably intrude[d] upon[] the Legislature's exercise of one of its core legislative powers: i.e., adopting a budget."  We disagree.  In *Mendly*, the dissent took issue with the majority's opinion by emphasizing the stipulated judgment was a final judgment that involved a financial component; it was not merely an injunction requiring the state to comply with a statute. (*Mendly*, *supra*, 23 Cal.App.4th at pp. 1250–1251 (dis. opn. of Johnson, J.).) These points of distinction are not relevant here, where the judgment is neither final nor involves a financial payment.  Rather, the order at issue constitutes the type of injunction the dissent acknowledges is subject to amendment by the Legislature.  (*Id.* at p. 1250 ["Had [the] judgment merely enjoined the county to conduct the types of studies and otherwise comply with [the applicable statute], it would have fit the model of a 'declaratory judgment and injunctive decree.' "].)

SBN does not dispute the Legislature is entitled to amend CEQA to meet changing policy goals.  (See *Saltonstall v. City of Sacramento* (2014) 231 Cal.App.4th 837, 854 [" 'CEQA remains a legislative act, subject to

legislative limitation and legislative amendment' "].)  And SBN has not cited any authority suggesting the Legislature cannot prioritize access to education via enrollment levels over certain environmental concerns.  Accordingly, we find Senate Bill 118 constitutional and applicable to the trial court's judgment.

### b. *Application of Senate Bill 118 to the Judgment*

In evaluating whether Senate Bill 118 renders the trial court's order unenforceable, we apply well-established principles of statutory interpretation.  " 'We consider first the words of a statute, as the most reliable indicator of legislative intent.' [Citation.]  In doing so, we give the words 'their usual and ordinary meaning,' viewed in the context of the statute as a whole.  [Citation.]  As part of this process, ' " [every] statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " ' [Citation.] [¶] When the language of a statute is ambiguous—that is, when the words of the statute are susceptible to more than one reasonable meaning, given their usual and ordinary meaning and considered in the context of the statute as a whole—we consult other indicia of the Legislature's intent, including such extrinsic aids as legislative history and public policy." (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184.)

Here, subdivision (e)(2) of section 21080.09 makes any "injunction or judgment in effect . . . suspending or otherwise affecting enrollment . . . unenforceable."  Thus, the plain language of the statute renders unenforceable the trial court's order voiding any decisions by the Regents to

increase student enrollment and suspending any further increases in student enrollment.[14]

Moreover, section 21080.09, subdivision (e)(1) limits any court from entering a future order limiting UC Berkeley's campus population due to shortcomings in the SEIR. While courts are permitted to "enjoin increases in campus population that exceed the projections adopted in the most recent long-range development plan and analyzed in the supporting environmental impact report," subdivision (e)(1) requires the court to (1) "determine[] that increases in campus population exceed[ed] the projections adopted in the most recent long-range development plan and analyzed in the supporting environmental impact report"; (2) determine "those increases result in significant environmental impacts"; (3) "order the campus or medical center to prepare a new, supplemental, or subsequent environmental impact report"; and (4) find "a new, supplemental, or subsequent environmental impact report has not been certified within 18 months of that order." (§ 21080.09, subd. (e)(1).) Here, the Regents have already satisfied the fourth step by preparing and certifying the 2021 EIR, which addressed the increased campus population at UC Berkeley. Accordingly, section 21080.09 prohibits courts from granting the relief imposed in connection with SBN's challenge to the SEIR's increased enrollment analysis and precludes any further injunction as to enrollment or campus population at this time.

These two changes—certification of the 2021 EIR and passage of Senate Bill 118—present a unique set of circumstances which, as a result, restrict this court from " 'provid[ing] the parties with effective relief.' "

---

[14] Because we conclude section 21080.09, subdivision (e) voids the enrollment pause remedy in the trial court's judgment and writ, we need not address the parties' remaining arguments as to this issue.

(*Golden Gate Land Holdings LLC v. East Bay Regional Park Dist.*, *supra*, 215 Cal.App.4th at p. 366.) We thus conclude SBN's challenge to the increased enrollment analysis in the SEIR is moot.

While the findings and judgment in connection with the increased enrollment analysis are moot and superseded by Senate Bill 118, the same is not necessarily true as to the Upper Hearst Development project. Accordingly, we consider the issues raised in SBN's cross-appeal to assess whether the Regents' certification of the Upper Hearst Development project runs afoul of CEQA in connection with any of SBN's nonenrollment-based challenges.

## D. The Cross-appeal

To the extent SBN's cross-appeal challenges the trial court's findings in connection with the increased enrollment analysis, those issues are moot for the reasons stated above. However, SBN also challenges certain aspects of the SEIR addressing the Upper Hearst Development project. Specifically, SBN argues (1) the SEIR's project description violates CEQA, (2) the SEIR failed to properly identify mitigation measures for significant impacts on historic resources, and (3) the SEIR failed to consider increased aesthetic impacts from increased enrollment.

### 1. The Project Description

SBN argues the "uncertain" project description "subverted public comment." SBN asserts the notice of preparation stated the SEIR would conduct environmental review of student enrollment increases, whereas the SEIR itself claimed such review was merely part of an " 'updated population baseline' " and did not constitute a project under CEQA. SBN claims these statements were confusing because the " 'project description' " must include

32

activities that may cause environmental impact, and an incomplete project description undermines a full analysis of project impacts.

"An accurate description of the proposed project is 'the heart of the EIR process.' [Citation.] 'An accurate project description is necessary for an intelligent evaluation of the potential environmental effects of a proposed activity. [Citation.]' [Citation.] ' "A curtailed or distorted project description may stultify the objectives of the reporting process. Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance. An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." ' " (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 369–370.) We review the adequacy of a project description de novo. (*Washoe Meadows Community v. Department of Parks & Recreation* (2017) 17 Cal.App.5th 277, 287.)

"To further the objectives of CEQA, the term 'project' is defined broadly as any 'activity which is being approved and which may be subject to several discretionary approvals by governmental agencies.' A project encompasses 'the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately . . . .' ([Cal. Code Regs., tit. 14], § 15378, subds. (a), (c); [citation].)" (*Rio Vista Farm Bureau Center v. County of Solano*, *supra*, 5 Cal.App.4th at p. 370, fn. omitted.)

However, section 21080.09, as amended by Senate Bill 118, clarified "[e]nrollment or changes in enrollment, by themselves, do not constitute a project as defined in Section 21065." (§ 21080.09, subd. (d).) Thus,

section 21080.09 supports the SEIR's omission of a direct reference to student enrollment increases in the project description.

Moreover, the trial court concluded: "The SEIR describes the Upper Hearst Development as the relevant project. That project description does not shift from one part of the SEIR to another. The SEIR situates that project within its larger context of increasing student enrollment and discusses cumulative effects. The SEIR's definition is clear enough that reasonable members of the public would not be misled about the scope of the project under review . . . ." We agree. The project described in both the draft and final SEIR is the Upper Hearst Development project. The "Project Summary" section of the SEIR contains three subsections: (1) "Proposed Project"; (2) "Environmental Analysis"; and (3) "Project Alternatives." While the "Proposed Project" subsection discusses the Upper Hearst Development project, the "Environmental Analysis" subsection of the project summary states: "[T]he Draft SEIR also establishes an updated population baseline to reflect the existing campus headcount (which is greater than the projections in the [2005 EIR] . . . . [I]n its response to comments to the [2005 EIR], UC Berkeley made a commitment to the City of Berkeley that, if enrollment increased beyond the projections set forth in the [2005 EIR], it would undertake additional review under CEQA. [¶] Consistent with this commitment, the SEIR uses an updated population baseline and, in its environmental analysis of each impact category, takes this updated baseline into account . . . ." The project summary thus sets forth both the specific construction project being reviewed—i.e., the Upper Hearst Development project—and the scope of the environmental analysis being conducted—i.e., review of both the Upper Hearst Development project and the increased student enrollment.

34

SBN argues *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185 (*Inyo*) and *City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438 (*Santee*) support its position. We find those cases distinguishable. In *Inyo*, the court evaluated the adequacy of an EIR addressing groundwater extraction. (*Inyo*, at p. 189.) The court noted "the project concept expands and contracts from place to place within the EIR." (*Id.* at p. 190.) It noted the EIR varied from a narrow project on groundwater, to a " 'reappraisal' of the rate of water export" to a third " 'recommended project' " involving both groundwater extraction and management of certain water exports. (*Id.* at p. 197.) The court concluded "[t]he incessant shifts among different project descriptions . . . vitiate the city's EIR process as a vehicle for intelligent public participation" and ran afoul of CEQA. (*Inyo*, at pp. 197, 200.)

In *Santee*, the Fourth Appellate District evaluated an EIR addressing construction of a temporary expansion to existing detention facilities. (*Santee*, *supra*, 214 Cal.App.3d at p. 1443.) The court noted the EIR was ambiguous and contradictory as to how long the "temporary" expansion would be in use, with the EIR referencing both a three-year and a seven-year period. (*Id.* at p. 1451.) The court also noted it was reasonably foreseeable the expansion would be in use for longer than seven years. (*Ibid.*) The court thus found the EIR inadequate, explaining the lack of clarity regarding the length of its use was problematic and the EIR needed to address "the true scope of the project for intelligent weighing of the environmental consequences of the project." (*Id.* at pp. 1454–1455.)

Here, the SEIR was consistent in its discussion of the project and the scope of its environmental review. Likewise, while the SEIR discussed a project that was a component of a larger framework for UC Berkeley's development and growth, the Regents had already adopted the programmatic

EIR—i.e., the 2005 EIR—that was missing in *Santee*. As SBN acknowledges, "[t]he ultimate inquiry . . . is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516.) We conclude the SEIR properly did so.

## 2. Mitigation Measures for Significant Impacts to Historical Resources

The SEIR's mitigation measure to reduce significant impacts on historic properties provides that "UC Berkeley shall retain a historic architect . . . to review plans for the proposed academic and residential buildings," and that architect "shall provide input and refinements to the design team . . . to improve compatibility with neighboring historical resources and compliance with the Secretary of the Interior's Standards."

SBN argues this approach improperly defers creation of the actual mitigation measure until after project approval, citing *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681 (*POET*). This situation is distinguishable from *POET*. In that matter, the State Air Resources Board noted certain potential environmental impacts (increased emissions of nitrogen oxide) and stated it believed such impacts "can be mitigated by adjustments to fuel specifications" without the adoption of any specific mitigation measure. (*Id.* at p. 734.) Here, the SEIR sets forth a specific mitigation measure—retaining an architect to provide input on the design.

However, SBN's argument that the mitigation measure is insufficient has merit. "Partial effectiveness is necessary for the measure to be labeled a 'mitigation measure.' While the *extent* of the mitigation may be uncertain, there must be some reductions or offsets for the label 'mitigation measure' to be accurate. The partial effectiveness requirement is derived from the

36

mandatory language in our Supreme Court's statement that '[m]itigation measures need not include precise quantitative performance standards, *but they must be at least partially effective*, even if they cannot mitigate significant impacts to less than significant levels.' " (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 865, italics added by *King & Gardiner Farms*.) Likewise, CEQA Guidelines allow "[t]he specific details of a mitigation measure" to be "developed after project approval . . . provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will be considered, analyzed, and potentially incorporated in the mitigation measure." (Cal. Code Regs., tit. 14 § 15126.4, subd. (a)(1)(B).)

SBN asserts the mitigation measure only "result[s] in *recommendations*" for UC Berkeley to " 'consider.' " We agree. The mitigation measure neither requires the Regents to comply with the Secretary of Interior's Standards nor incorporates recommendations from the architect. Rather, it only requires the Regents to "retain a historic architect" to review the building plans. While the architect "shall provide input and refinements to the design team," nothing in the mitigation measure requires the design team to accept or incorporate those recommendations.[15]

However, the lack of a meaningful mitigation measure does not necessarily doom the SEIR in light of the Regents' conclusion that the impact of the project—regardless of whether it utilizes the mitigation measure—is

---

[15] The trial court found the mitigation measure "requires the University to adopt the Secretary of Interior's Standards." The Regents acknowledge the mitigation measure does not impose such a commitment.

significant and unavoidable and no other mitigation measure is feasible. Rather, we must consider whether the Regents have adequately complied with statutory requirements for "significant and unavoidable" impacts.

"A public agency may approve a project that will have a significant effect on the environment if the agency finds that: (1) '[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the [EIR],' and (2) the significant effects on the environment are outweighed by 'specific overriding economic, legal, social, technological, or other benefits of the project.' " (*Los Angeles Conservancy v. City of West Hollywood* (2017) 18 Cal.App.5th 1031, 1041.) Similarly, "[i]f the reductions and offsets achieved by feasible mitigation measures [are] insufficient to render the environmental impact insignificant, the lead agency still may approve the project if it adopts a statement of overriding considerations." (*King & Gardiner Farms, LLC v. County of Kern*, *supra*, 45 Cal.App.5th at p. 852, citing § 21081, subd. (b).)

Here, the Regents found any mitigation effort would fail to reduce the project impact to insignificant levels due to, in relevant part, "incompatibility of scale and massing." Due to this incompatibility, the Regents found "[t]he Project [(Upper Hearst Development project)] will degrade the integrity of feeling and setting of historical resources adjacent to the Project site, which will contribute to a significant and unavoidable cumulative impact on historical resources." The Regents concluded "specific economic, legal, social, technological, or other considerations make it infeasible to reduce this impact to a less than significant level" because reducing the scale of the Upper Hearst Development project "would not fully meet objectives related to fulfilling the academic needs of the School's program. . . . [and] would not fully meet objectives to provide housing on-site . . . ." Accordingly, the

38

Regents found "the benefits of the Project outweigh the Project's significant adverse environmental effects" for various reasons, including "to support a vital intellectual and engaged community," to "provid[e] housing for UC Berkeley faculty and staff that is easily accessible to campus," and to "recruit[] and retain[] top-tier graduate and professional students, expert faculty and scholars, as well as ensuring the ongoing success and sustainability of the School's programs."

SBN argues the Regents abused its discretion in approving the project because the SEIR failed to explain the uncertainty regarding why the impact on historical resources could not be reduced to insignificant levels. Specifically, SBN argues the Regents did not clarify whether compliance with the Secretary of the Interior's Standards would be insufficient to reduce impacts to less than significant, compliance with the standards would be infeasible, or compliance would be feasible and reduce impacts to less than significant but reserved the right not to comply with those standards. As such, SBN argues this uncertainty violates CEQA. However, this argument overlooks the basis identified in the SEIR for ongoing significant impacts— namely, the "incompatibility of scale and massing." And the Regents concluded the only potential mitigation—a reduction in scale—was incompatible with the project goals. Accordingly, we cannot conclude the Regents abused their discretion in concluding there were no feasible mitigation measures to reduce the impact on historical resources to less than significant levels, and they appropriately adopted findings and a statement of overriding considerations as required by CEQA.

### 3. Impact from Increased Street Trash

SBN argues the SEIR failed to adequately analyze comments that increased enrollment caused significant aesthetic impacts from increased

trash dumped by students living off campus.  We need not reach the merits of this issue.  As discussed in part II.C., *ante*, challenges related to the SEIR's analysis of increased enrollment are moot due to the Regents' certification of the 2021 EIR.  This conclusion encompasses SBN's challenge as to whether the SEIR adequately analyzed aesthetic impacts from increased enrollment beyond the levels set forth in the 2005 EIR.

## III.  DISPOSITION

The trial court's judgment granting SBN's writ petition is vacated, and the matter is remanded to the trial court to enter an order dismissing SBN's petition.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)

MARGULIES, ACTING P. J.

WE CONCUR:


BANKE, J.


SWOPE, J.[*]

A163810
*Save Berkeley's Neighborhoods v. Regents of University of California*

---

[*] Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

41

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SAVE BERKELEY'S NEIGHBORHOODS,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>        Defendants and Appellants. | A163810<br><br>(Alameda County<br> Super. Ct. No. RG19022887)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on April 27, 2023, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports, with the exception of parts II.A., II.B., and II.D.

Appellant Save Berkeley's Neighborhoods' petition for rehearing is denied.

There is no change in the judgment.

Dated:

_____
Margulies, Acting P.J.

Trial Court:        Superior Court of Alameda County

Trial Judge:        Hon. Brad Seligman

Counsel:

The Sohagi Law Group, PLC, Nicole H. Gordon, Margaret M. Sohagi, Mark J.G. Derosiers; Office of the General Counsel—University of California, Charles F. Robinson, Alison L. Krumbein; UC Berkeley, Office of Legal Affairs and David M. Robinson for Defendants and Appellants.

Law Offices of Thomas N. Lippe, APC and Thomas N. Lippe for Plaintiff and Appellant.

Colantuono, Highsmith & Whatley, PC, Holly O. Whatley, Pamela K. Graham and Merete E. Rietveld for City of Goleta and City of Santa Cruz as Amicus Curiae on behalf of Plaintiff and Appellant.